### IN THE UNITED STATES DISTRICT COURT FOR THE
### DISTRICT OF MASSACHUSETTS

JUL 1 PM 2:19

| | |
|---|---|
| **AURON CAELUM STARK©™** | **DOCKET NO.** |
| **by and through auron-caelum: stark©™,** ) | **3:26-cv-30040-MGM** |
| **living man, Executor and Beneficial Heir** ) | |
| ) | |
| **Plaintiff** ) | **AMMENDED COMPLAINT FOR** |
| V. ) | **SECURITIES FRAUD, WRONGFUL** |
| ) | **FORECLOSURE, BREACH OF** |
| ) | **FIDUCIARY DUTY, AND VIOLATIONS** |
| **MOVEMENT MORTGAGE, LLC;** ) | **CONSUMER PROTECTIONS STATUTES** |
| **SERVICEMAC, LLC;** ) | |
| **MARINOSCI LAW GROUP, P.C.;** ) | |
| **MORTGAGE ELECTRONIC** ) | |
| **REGISTRATION SYSTEMS, INC. (MERS);** ) | |
| **SPECIALIZED LOAN SERVICING, LLC;** ) | |
| **GOLDMAN SACHS MORTGAGE COMPANY;** ) | |
| **PACIFIC COAST CAPITAL PARTNERS, LLC;** ) | |
| **and DOES 1-20,** ) | |
| **Defendants.** ) | |
| _____) | |

## I. INTRODUCTION AND EXECUTIVE SUMMARY

1. This action arises from a coordinated scheme of securities fraud, predatory lending, and unlawful foreclosure perpetrated by a network of defendants who securitized Plaintiff's mortgage without his knowledge or consent, deliberately manufactured his default to trigger investor profits, and now seek to foreclose on his home despite lacking legal standing to do so. The foreclosure sale is scheduled for July 9, 2026, mere days away, threatening Plaintiff with imminent loss of his home and $174,000 in equity.

2. Plaintiff pleads the following factual allegations with the specificity required by *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 540 (2007). Each factual allegation is either within Plaintiff's personal knowledge or is based on reasonable investigation, and each allows the Court to draw the reasonable inference that Defendants are liable for the misconduct alleged.

### A. The Scheme in Overview

3. In May 2021, Plaintiff obtained a $195,395 FHA-insured mortgage loan for his home at 14 Goodman Lane, Pittsfield, Massachusetts. For nearly three years, Plaintiff made every payment on time. In November 2024, after job loss, Plaintiff sought loss mitigation assistance. Instead of receiving help, Plaintiff was deliberately told, falsely and in violation of federal regulations, that he could not receive assistance until he was ninety days delinquent.

4. Unbeknownst to Plaintiff, his loan had been securitized immediately upon origination. His promissory note was sold and aggregated into a Ginnie Mae mortgage-backed security pool identified by Pool CUSIP 3140G1XZ7 ("Ginnie Mae Pool 2021-18"). The cash flows from Plaintiff's loan and this entire pool were purchased by PIMCO (Pacific Investment Management Company) through PIMCO Ginnie Mae Trust 2023-A (CUSIP 72248RAB3), a private placement collateralized mortgage obligation owned entirely by PIMCO, one of the world's largest bond managers.

5. This securitization structure created a perverse financial incentive: when Plaintiff defaulted, Defendants would file a claim on FHA mortgage insurance (triggered at 90-day delinquency), collect payment from the federal government, and then foreclose to capture additional equity. Plaintiff would lose his home; the servicer would profit from both insurance proceeds and foreclosure proceeds while investors (PIMCO) faced zero risk due to Ginnie Mae's guarantee.

6. Defendants manufactured Plaintiff's default through deliberate misrepresentation of FHA requirements, placed him in a forbearance without documentation, then locked him out of his payment system when he tried to cure. They failed to respond to his Qualified Written Requests for verification of the debt, recorded a void assignment from MERS (who held no beneficial interest in the note), and proceeded with foreclosure despite lacking standing under Massachusetts law.

7. Plaintiff now faces loss of his home on July 9, 2026.

## B. Applicable Legal Standards

8. To satisfy the pleading requirements explained by this Court, Plaintiff provides factual allegations that allow the Court to draw the reasonable inference that Defendants are liable. Plaintiff avoids naked assertions and labels, provides factual enhancement beyond formulaic recitations, and alleges violations of specific actionable legal theories with causation between conduct and injury. Each allegation that is not within Plaintiff's personal knowledge is stated upon information and

belief based on reasonable investigation, including review of public records, securitization databases, regulatory filings, and analysis of Defendants' conduct.

## C. Burden of Proof Regarding Securitization Allegations and Discovery Obligations

9. The factual allegations regarding Plaintiff's loan securitization, including but not limited to the actual CUSIP designations, pool identifications, derivative instruments, and investor ownership, are based upon Plaintiff's independent investigation, including comprehensive database verification through the Securities Industry and Financial Markets Association (SIFMA) CUSIP database, securitization research databases, and analysis of loan-level characteristics. These allegations are NOT based upon information or disclosures provided by Defendants.

10. Defendants have within their exclusive possession and control complete documentation regarding: (a) the actual securitization of Plaintiff's loan; (b) the actual CUSIP designations and pool identifications; (c) the actual investor ownership structure; (d) the actual derivative instruments; and (e) all pooling and servicing agreements, securitization prospectuses, and loan-level disclosures.

11. Defendants have already demonstrated their refusal to produce such documentation by: (1) completely failing to respond to Plaintiff's Qualified Written Request dated October 17, 2025, which explicitly requested "complete chain of assignment of the mortgage and promissory note" and "proof of Defendants' legal authority to collect and to initiate foreclosure"; and (2) completely failing to respond to Plaintiff's Qualified Written Request dated November 25, 2025, which reiterated all prior requests and additionally demanded "copies of all servicing files and loan documentation" and "proof that all foreclosure documents were prepared in compliance with Massachusetts law and federal requirements."

12. Because Defendants have refused to provide these documents through their obligatory responses to Qualified Written Requests, and because Defendants maintain exclusive possession and control of the securitization documentation, the burden now shifts to Defendants to produce, during discovery in this action, complete and accurate documentation regarding: (a) The actual Master Loan CUSIP under which Plaintiff's promissory note is identified; (b) The actual Master Pool CUSIP under which Plaintiff's loan is securitized; (c) Complete and accurate identification of the actual investor ownership structure; (d) Complete and accurate identification of all investors or purchasers of any securities, cash flows, or interests derived from or collateralized by Plaintiff's

promissory note and mortgage; (e) Complete and accurate identification of the guarantor of any mortgage-backed security in which Plaintiff's loan is included; (f) The actual derivative instrument (CUSIP and name) in which Plaintiff's loan serves as collateral; (g) Any and all pooling and servicing agreements governing Plaintiff's loan; (h) Any and all securitization prospectuses or disclosure documents that reference Plaintiff's loan; (i) Any and all loan-level disclosure documents identifying Plaintiff's loan within any securitization; (j) Complete documentation of any assignment of Plaintiff's promissory note or mortgage, including endorsements, transfer documents, and proof of delivery; (k) Proof of possession of the original promissory note bearing Plaintiff's original wet ink autograph; (l) Complete documentation of any FHA mortgage insurance claims filed on Plaintiff's loan, including dates filed, amounts claimed, and amounts paid.

13. If, upon discovery, Defendants produce documentation that contradicts the allegations in this Complaint regarding securitization structure, CUSIP designations, pool identifications, or investor ownership, Plaintiff expressly reserves the right to amend this Complaint to reflect accurate information. Conversely, if Defendants fail to produce such documentation, or if the documentation Defendants produce does not contradict the allegations herein, such failure or omission will support an inference under Federal Rule of Evidence 501 and Massachusetts Evidence Rule 413 that the allegations regarding securitization structure are true.

14. Plaintiff places Defendants on notice that: (a) Plaintiff has obtained verified information through independent investigation demonstrating that the securitization structure alleged herein is accurate; (b) Defendants' burden in discovery is to produce evidence that contradicts these verified findings, not merely to refuse production or to produce vague certifications; (c) The complete absence of documentary evidence from Defendants regarding securitization structure—combined with Defendants' prior refusal to respond to Qualified Written Requests—will support an inference that Defendants cannot or will not produce such documentation because it does not support their claims of authority to collect and foreclose; (d) Federal Rules of Civil Procedure 33 (Interrogatories), 34 (Requests for Production of Documents), and 36 (Requests for Admission) will be used to compel Defendants to produce, acknowledge, or deny the specific securitization allegations in this Complaint.

15. Furthermore, Plaintiff alleges that Defendants' failure to respond to the October 17, 2025 and November 25, 2025 Qualified Written Requests constitutes an admission under 12 U.S.C. § 2605(e) that Defendants cannot verify or validate the debt, that Defendants cannot establish their authority to collect or foreclose, and that Defendants lack possession of the original promissory

4 of 38

note and valid chain of assignment. This failure to respond, combined with Defendants' continued pursuit of foreclosure, supports an inference of consciousness of guilt and knowledge of defects in Defendants' standing.

## II. JURISDICTION AND VENUE

16. This Court has subject-matter jurisdiction under 28 U.S.C. § 1331 because Plaintiff asserts claims arising under federal law, including the Securities Act of 1933, 15 U.S.C. § 77a et seq.; the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.; the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2601 et seq.; and the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 et seq.

17. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims arising under Massachusetts law, including claims for wrongful foreclosure, breach of fiduciary duty, and unfair and deceptive practices under Massachusetts General Laws Chapter 93A, because those claims form part of the same case or controversy.

18. This Court has authority to grant declaratory relief under 28 U.S.C. §§ 2201-2202 and injunctive relief under Federal Rule of Civil Procedure 65.

19. Venue is proper in this District under 28 U.S.C. § 1391(b) because the Property is located in Berkshire County within this District, and a substantial part of the events giving rise to the claims occurred in this District, including recording of the mortgage, recording of the MERS assignment, initiation of foreclosure proceedings in Massachusetts Land Court, and communications with Plaintiff regarding servicing of the loan.

## III. PARTIES

### A. Plaintiff

20. Plaintiff Auron Caelum Stark is a natural person who is domiciled at and is the inhabitant of the real property located at 14 Goodman Lane, Pittsfield, Massachusetts [01201] (the "Property"). Plaintiff is the borrower named on the promissory note dated May 3, 2021, and the mortgage securing that note, recorded on May 3, 2021 in the Berkshire County (Middle District) Registry of Deeds at Book 6900, Page 104.

## B. Defendants

21. Defendant Movement Mortgage, LLC is a Delaware limited liability company with its principal place of business at 8024 Calvin Hall Road, Fort Mill, South Carolina 29707. Movement Mortgage claims to hold the mortgage and promissory note encumbering the Property and is the party on whose behalf foreclosure proceedings have been initiated. Movement Mortgage is the public-facing servicer and point of contact for borrowers but is actually controlled and directed by Specialized Loan Servicing, LLC.

22. Defendant ServiceMac, LLC is a mortgage servicer that acted as servicer and/or sub-servicer with respect to Plaintiff's loan. ServiceMac is owned and operated by Specialized Loan Servicing, LLC and received and failed to respond to Plaintiff's Qualified Written Requests. ServiceMac is the customer-facing brand through which borrowers communicate with Specialized Loan Servicing.

23. Defendant Marinosci Law Group, P.C. is a law firm organized under Rhode Island law with principal offices at 275 West Natick Road, Suite 500, Warwick, Rhode Island 02886. Marinosci acts as foreclosure counsel and is prosecuting the foreclosure proceedings affecting the Property, filing documents it knew or should have known were legally defective.

24. Defendant Mortgage Electronic Registration Systems, Inc. ("MERS") is a corporation organized under Delaware law with principal offices in Flint, Michigan. MERS was named as mortgagee "solely as nominee" for the original lender in the mortgage recorded at Book 6900, Page 104. MERS purportedly assigned the mortgage to Movement Mortgage via an assignment recorded on March 10, 2025 at Book 07789, Page 348. Under controlling Massachusetts law, this assignment is void.

25. Defendant Specialized Loan Servicing, LLC ("SLS") is a mortgage servicer that acts as the master servicer and true operational controller of the mortgage-backed security pool containing Plaintiff's loan. SLS makes actual decisions regarding modifications, forbearances, and foreclosures. SLS owns and operates the ServiceMac brand as its customer-facing interface and receives directives from Ginnie Mae regarding pool-level performance targets.

26. Defendant Goldman Sachs Mortgage Company is a mortgage company that purchased Plaintiff's loan from the original lender (Pacific Coast Capital Partners, LLC) and aggregated it with other FHA-insured loans for securitization.



27. Defendant Pacific Coast Capital Partners, LLC is a Delaware limited liability company that acted as the warehouse lender and originator, funding Plaintiff's loan on May 3, 2021, and immediately selling it to Goldman Sachs Mortgage Company.

28. Defendants Does 1-20 are unknown individuals and entities involved in the securitization, sale, pooling, and servicing of Plaintiff's mortgage note, including officers and directors of the named Defendants who made specific decisions to orchestrate the scheme alleged herein. Plaintiff reserves the right to amend this Complaint to identify such parties by name upon discovery.

## IV. FACTUAL ALLEGATIONS

### A. The Loan and Property

29. On May 3, 2021, Plaintiff obtained a residential mortgage loan in the principal amount of $195,395.00 to purchase the Property. Plaintiff executed a promissory note and mortgage in connection with this loan, both dated May 3, 2021.

30. The mortgage was recorded on May 3, 2021 in the Berkshire County (Middle District) Registry of Deeds at Book 6900, Page 104. The mortgagee of record was listed as Mortgage Electronic Registration Systems, Inc., "solely as nominee" for the original lender.

31. The loan was insured by the Federal Housing Administration (FHA) under FHA Case Number 251-6990123-703 and assigned Loan Number 3380304. The FHA insurance provided security to the lender and required compliance with specific FHA servicing standards designed to protect borrowers, including loss-mitigation requirements and borrower communication standards.

32. The fair market value of the Property is approximately $369,050 based on property tax assessments and comparable sales data. As of the date of filing, the remaining mortgage balance is approximately $196,000, leaving Plaintiff with equity of approximately $147,000 built through five years of timely payments and property maintenance.

### B. Plaintiff's Perfect Payment History

33. From May 3, 2021 through November 2024, Plaintiff made every single mortgage payment on time and in full. Plaintiff's payment history demonstrates financial responsibility and creditworthiness. Plaintiff was never delinquent on the mortgage prior to November 2024.

34. During this same period, Plaintiff paid all property taxes, homeowners insurance, and other obligations associated with the Property on time and in full. Plaintiff's creditworthiness prior to November 2024 was excellent.

**C. Employment Loss and Request for Loss Mitigation**

35. In November 2024, Plaintiff experienced unexpected job loss. Like many Americans facing economic hardship, Plaintiff proactively contacted his mortgage servicer to request loss-mitigation assistance to help him avoid default.

36. During a telephone conversation with a servicer representative, Plaintiff was told that the servicer could not provide any loss-mitigation assistance unless Plaintiff was at least ninety (90) days delinquent on his mortgage payments. The servicer representative made this statement as a factual claim about federal law and program requirements.

37. Plaintiff's roommate of approximately two years, who was physically present during this telephone conversation, personally heard the servicer representative make this 90-day delinquency requirement statement. This witness is prepared to provide sworn testimony corroborating this specific statement.

38. Upon information and belief, the 90-day delinquency requirement stated by the servicer representative violates applicable FHA loss-mitigation requirements. Under 24 C.F.R. § 203.604 and HUD guidance governing FHA-insured loans, servicers are required to evaluate borrowers for loss mitigation before a borrower becomes delinquent and are expressly prohibited from conditioning all loss-mitigation assistance on the borrower first becoming ninety days delinquent.

39. Upon information and belief, the 90-day delinquency threshold is significant because it triggers the servicer's and/or lender's ability to file claims on FHA mortgage insurance. Once a borrower is 90 days delinquent, the servicer can file an insurance claim with the FHA, and the FHA will pay out principal and interest on the loan. This creates a financial incentive to steer borrowers into 90-day delinquency to trigger insurance payments.

40. The servicer's insistence on the 90-day delinquency requirement served Defendants' financial interests (by triggering FHA insurance claims that benefit servicers and securitization investors) while directly harming Plaintiff's interests (by forcing him into avoidable default).

41. Based on the servicer's representation that he could not receive help until becoming 90 days delinquent, Plaintiff made the conscious and difficult decision to withhold his mortgage payments to become delinquent. This decision violated Plaintiff's personal commitment to timely payment,

but he believed he was following the servicer's guidance and complying with the requirements they had represented to him.

## D. The Forbearance Arrangement Without Documentation

42. After becoming approximately 90 days delinquent, Plaintiff contacted the servicer again. During this second telephone conversation, a servicer representative told Plaintiff that he had been "approved for a forbearance" under which his mortgage payments would be paused for three months, renewable in three-month increments up to a total of eighteen months if he remained without employment.

43. Plaintiff received this forbearance approval only by telephone. He was provided no written documentation whatsoever. Plaintiff has no written forbearance agreement, no written confirmation of terms, no written explanation of what would happen at the end of forbearance, and no written guidance on how to resume payments.

44. The complete absence of written documentation of forbearance terms is highly unusual and problematic in the mortgage servicing industry. Standard practice requires written agreements memorializing forbearance terms, including duration, payment resumption procedures, and treatment of accrued interest and late fees.

45. Relying on the servicer's verbal approval, Plaintiff extended the forbearance in three-month increments, each time calling to request extension and each time receiving only verbal confirmation with no written documentation.

46. Plaintiff extended the forbearance through approximately September 2025, a period of approximately ten to eleven months during which he made no mortgage payments.

47. During the entire forbearance period, the servicer provided no written agreement, no written confirmation of extension, no written explanation of terms, and no written guidance regarding Plaintiff's obligations or rights upon completion of forbearance, and no notice of default or intent to foreclose.

## E. Employment Restoration and the Payment Lockout

48. In September 2025, after approximately ten to eleven months of forbearance, Plaintiff secured new employment. He was employed and had income again. Plaintiff was eager and able to resume making his mortgage payments.

49. Upon securing employment, Plaintiff immediately attempted to resume making his mortgage payments by logging into his online mortgage payment account, which he had successfully used for over three years to make timely payments.

50. Plaintiff discovered that he had been locked out of his online payment account. He was unable to access the system and could not make electronic payments despite his willingness and financial ability to do so.

51. This payment lockout was completely unexpected and highly distressing. Plaintiff had the income and the willingness to make payments, but Defendants had prevented him from doing so through a technical lockout of his account.

52. Plaintiff attempted repeatedly to reach the servicer by telephone to explain his employment restoration and to request that his account be unlocked so he could resume payments.

53. During multiple phone calls, Plaintiff was unable to reach any representative who could assist him. He was transferred between departments, left on hold for extended periods, and disconnected. When he did reach representatives, they were unable or unwilling to provide information about why his account was locked or how to unlock it.

54. As a result of this payment lockout, Plaintiff was prevented from curing any claimed delinquency and from resuming his regular mortgage payments, despite his desire, willingness, and financial ability to do so.

55. The servicer's deliberate lockout of Plaintiff's payment account, combined with their refusal or inability to restore his access, constitutes an intentional interference with Plaintiff's contractual right to perform his obligations and constitutes fraudulent conduct designed to extend Plaintiff's delinquency and justify subsequent foreclosure.

## F. The Securitization and Hidden Ownership Structure

56. Upon information and belief, based on analysis of loan-level characteristics, CUSIP database verification, and securitization records, Plaintiff's promissory note—an FHA-insured loan—was sold and transferred into a securitized mortgage-backed security pool immediately upon origination in May 2021.

57. The securitization chain proceeded as follows: Pacific Coast Capital Partners, LLC (warehouse lender/originator) sold the loan to Goldman Sachs Mortgage Company, which aggregated Plaintiff's loan with other FHA-insured loans into a mortgage-backed security pool. Because Plaintiff's loan is an FHA-insured loan, it was pooled into a Ginnie Mae pass-through certificate



pool (not a Freddie Mac pool, as Freddie Mac primarily guarantees conventional, non-FHA loans).

58. Upon verified database analysis, Plaintiff's loan is actually identified within the securitization structure by the following CUSIPs: (a) Actual Master Pool CUSIP 3140G1XZ7 (Ginnie Mae Pool 2021-18), which is a valid and active Government National Mortgage Association pass-through certificate pool issued in 2021. This pool consists exclusively of FHA-insured and VA-guaranteed residential mortgage loans. Ginnie Mae, a division of the U.S. Department of Housing and Urban Development, guarantees the timely payment of principal and interest on this pool; and (b) Actual Derivative CUSIP 72248RAB3 (PIMCO Ginnie Mae Trust 2023-A), which is a private placement collateralized mortgage obligation backed entirely by the cash flows from Ginnie Mae Pool 2021-18.

59. Defendants have made false representations regarding Plaintiff's loan securitization and ownership structure. These false representations were designed to misdirect investigators, auditors, and legal advocates away from the correct securitization structure and true investor ownership. These false references constitute securities fraud and material misrepresentation regarding the nature and ownership of Plaintiff's loan.

60. The actual investor ownership structure is as follows: Upon verified analysis, Plaintiff's promissory note and mortgage are held as collateral backing the cash flows of PIMCO Ginnie Mae Trust 2023-A (CUSIP 72248RAB3), a private placement collateralized mortgage obligation. The cash flows from the entire Ginnie Mae Pool 2021-18 (CUSIP 3140G1XZ7), including Plaintiff's loan, were purchased in their entirety and held exclusively by PIMCO (Pacific Investment Management Company), one of the world's largest bond managers with over $2 trillion in assets under management. Plaintiff's loan does not collateralize publicly traded tranches but instead backs a single, privately held derivative instrument owned by PIMCO. This creates a simplified but highly concentrated investor ownership structure where a single, sophisticated institutional investor (PIMCO) bears the entire risk of the Ginnie Mae pool's performance.

61. Because Plaintiff's loan is held in a Ginnie Mae pass-through certificate pool, the securitization involves multiple layers of government backing: (a) the FHA insures the individual mortgage loan against borrower default; (b) Ginnie Mae guarantees timely payment to investors regardless of whether borrowers pay; and (c) the full faith and credit of the United States Government supports Ginnie Mae's guarantee. This multi-layered government backing creates a fundamental conflict of interest for the servicer: when a borrower defaults, the servicer can collect insurance proceeds from the FHA and guarantee proceeds from Ginnie Mae while simultaneously

foreclosing to capture home equity. The servicer profits from default through insurance and guarantee proceeds while investors (PIMCO) face no risk due to Ginnie Mae's guarantee. This structure created a powerful financial incentive for Defendants to manufacture Plaintiff's default.

62. Upon information and belief, Ginnie Mae directed Specialized Loan Servicing, LLC to manage the Ginnie Mae Pool 2021-18 in accordance with their risk management and performance optimization objectives. Because Ginnie Mae guarantees investor payments regardless of borrower performance, the investor (PIMCO) and guarantor (Ginnie Mae) have different incentives than borrower protection. Specialized Loan Servicing, operating through the ServiceMac brand as customer-facing interface, received directives prioritizing pool-level performance metrics over individual borrower protections. This created the deliberate steering of borrowers like Plaintiff toward manufactured default to trigger insurance claims and guarantee payments.

63. The actual operational servicer is Specialized Loan Servicing, LLC, which makes decisions regarding modifications, forbearances, and foreclosures for the entire Ginnie Mae pool. Specialized Loan Servicing operates through the ServiceMac brand as the customer-facing interface with borrowers. Movement Mortgage acts as the public-facing servicer and point of contact but is actually controlled and directed by Specialized Loan Servicing.

64. At no time did Defendants disclose to Plaintiff that his promissory note had been securitized and sold into a Ginnie Mae pool. Plaintiff was never informed of the securitization, never provided the Ginnie Mae prospectus or information, never provided the pooling and servicing agreement, and never informed of the actual investor ownership structure (PIMCO). Instead, Defendants provided false references to intentionally misdirect Plaintiff and obscure the actual securitization.

65. Plaintiff was never informed that his FHA-insured loan would be transferred from individual borrower-protection focused arrangements into a securitized structure where the servicer's financial incentives (profiting from default through FHA insurance claims) conflicted fundamentally with his interests (avoiding default and maintaining home ownership).

66. Plaintiff was never informed that his "servicer" (Movement Mortgage as public face; Specialized Loan Servicing as actual operator) had a direct financial incentive to manufacture his default. When Plaintiff defaulted, the servicer could file a claim on FHA mortgage insurance (triggered at 90-day delinquency), collect payment from the federal government, then foreclose and capture additional home equity. Plaintiff would lose his home; the servicer and investors would profit from manufactured default through insurance proceeds and foreclosure proceeds.



67. The deliberate concealment of securitization from Plaintiff, the provision of false securitization references, and the failure to disclose the actual investor ownership structure (PIMCO) and Ginnie Mae guarantor violated Plaintiff's right to informed consent and his right to understand material changes to his loan arrangement. This concealment also violated securities laws requiring disclosure of material information to investors in securities offerings.

68. The false references to securitization structure and the concealment of the actual investor and guarantor demonstrate that Defendants knowingly provided false information regarding the securitization, chain of custody, and investor ownership of Plaintiff's loan.

## G. Movement Mortgage's Prior FHA Fraud Settlement

69. Upon information and belief, based on public announcements by the United States Department of Justice, Defendant Movement Mortgage agreed in 2023 to pay the United States government $23,750,000.00 to settle allegations of systematic fraud under the False Claims Act.

70. The settlement resolved allegations that Movement Mortgage systematically made false certifications to the FHA and VA regarding loan quality and program compliance, certifying loans for insurance and guarantees despite knowing those loans did not meet applicable program requirements, and causing HUD and the VA to pay insurance and guarantee claims on ineligible loans.

71. The covered conduct in the settlement spanned the period from approximately 2008 to 2018.

72. The $23.75 million settlement is the largest single piece of evidence of Movement Mortgage's pattern and practice of systematic fraud related to FHA lending.

73. This prior settlement demonstrates that Movement Mortgage has: (a) Knowledge of FHA program requirements; (b) Intentionally disregarded those requirements; (c) Made false certifications to federal agencies knowingly; (d) Been willing to commit fraud for corporate profit; and (e) Established a corporate culture where deception is accepted practice.

74. The fact that Movement Mortgage paid $23.75 million to settle FHA fraud allegations covering the period 2008-2018, yet continued identical predatory servicing practices with Plaintiff's 2021 loan, demonstrates that the settlement did not deter Movement Mortgage's conduct and that Movement Mortgage understands the rules it violates.

## H. The Void MERS Assignment

75. The mortgage recorded at Book 6900, Page 104 named MERS as mortgagee "solely as nominee" for the original lender.

76. On March 10, 2025, MERS executed an assignment purporting to assign the mortgage to Movement Mortgage, LLC. This assignment was recorded in the Berkshire County (Middle District) Registry of Deeds at Book 07789, Page 348.

77. Upon information and belief, this MERS assignment is void and of no legal effect under controlling Massachusetts law, specifically under *Eaton v. Federal National Mortgage Association*, 462 Mass. 569 (2012).

78. In *Eaton*, the Massachusetts Supreme Judicial Court held unambiguously: "Where MERS is listed as the mortgagee in a mortgage, but is not the true mortgagee because it has no beneficial interest in the mortgage, MERS has no authority to foreclose on the mortgage and no authority to assign the power of sale that accompanies the mortgage." *Eaton*, 462 Mass. at 580-581.

79. Because Plaintiff's promissory note was securitized and transferred to investors and held as collateral for PIMCO Ginnie Mae Trust 2023-A, MERS held no beneficial interest in the note.

80. Because MERS held no beneficial interest in the note, MERS lacked authority to execute the March 10, 2025 assignment to Movement Mortgage.

81. The assignment is void ab initio (void from the beginning) and conveys no rights, no standing, and no authority to Movement Mortgage.

82. Movement Mortgage's entire claim to authority to foreclose depends on the void MERS assignment. Without valid authority derived from a valid assignment, Movement Mortgage cannot legally foreclose on the Property.

83. The recording of this void assignment in the Registry of Deeds created a cloud on Plaintiff's title and a false appearance that Movement Mortgage held valid authority to foreclose, when in fact no such authority existed.

## I. Lack of Possession of Original Promissory Note

84. Defendants Movement Mortgage, LLC, despite receiving Plaintiff's Qualified Written Requests on October 17, 2025 and November 25, 2025 specifically requesting production of the original promissory note, have not produced the original note.

85. Defendants have not provided any evidence of proper endorsements transferring the note from the original lender through any chain of custody to Movement Mortgage.



14 of 38

86. Defendants have not established any valid chain of title showing how they acquired the right to enforce the note.

87. ServiceMac, the servicer, issued a vague certification claiming that Movement Mortgage is "the owner of both the Mortgage and the Note," but this certification is legally insufficient because: (a) it comes from a servicer with no ownership interest in the note; (b) it is not based on personal knowledge of the servicer; (c) it provides no factual foundation for the assertion; and (d) it does not satisfy the requirements of *U.S. Bank National Ass'n v. Ibanez*, 458 Mass. 637 (2011), which requires actual possession of the original note with documented chain of transfer.

88. Under *Ibanez*, a party seeking to foreclose by power of sale must hold and possess the original promissory note at the time the notice of foreclosure sale is published and must be able to demonstrate a valid chain of assignment showing transfer from the original lender through each intermediate holder to the current party seeking to foreclose.

89. Defendants cannot satisfy the *Ibanez* requirement because they do not possess the original note and cannot demonstrate a valid chain of assignment.

90. Without possession of the original note and valid chain of assignment, Movement Mortgage lacks standing to foreclose under clearly established Massachusetts law.

**J. The Fraudulent January 9, 2026 Affidavit**

93. On or about January 9, 2026, an affidavit was filed in the foreclosure proceedings (Massachusetts Land Court File Number 25-06071-FC) purportedly signed by "Thomas Abbalie, Vice President of Movement Mortgage."

94. This affidavit allegedly verified certain facts regarding Plaintiff's loan, the chain of title, and Movement Mortgage's authority to foreclose.

95. Upon information and belief, based on independent research including review of Movement Mortgage's public website, SEC filings, corporate records, regulatory filings, and public business databases, no person named Thomas Abbalie holds or has ever held the position of Vice President at Movement Mortgage.

96. Plaintiff has conducted reasonable investigation including search of: Movement Mortgage's official corporate website; SEC filings and corporate leadership disclosures; LinkedIn and professional networking databases; and business record databases. This investigation yielded no evidence of any person named Thomas Abbalie associated with Movement Mortgage in any capacity, let alone as a Vice President.

97. The filing of an affidavit purportedly sworn by a non-existent officer constitutes: (a) perjury (swearing falsely); (b) fraud upon the court; (c) violation of Massachusetts rules of civil procedure; and (d) rendering the entire foreclosure proceeding tainted with illegality.

98. The fact that Defendants would file an affidavit by a non-existent person demonstrates Defendants' willingness to fabricate documents to support the foreclosure and proves consciousness of guilt regarding inability to establish standing through legitimate means.

## K. Qualified Written Requests and Silence

99. On October 17, 2025, Plaintiff served a comprehensive Qualified Written Request (QWR) on Defendant Movement Mortgage, LLC pursuant to the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605(e). Plaintiff sent this QWR via United States Postal Service with delivery confirmation, ensuring receipt and creating evidentiary record of service.

100. The October 17, 2025 QWR requested the following information: complete payment history showing all payments made and how they were applied; complete chain of assignment of the mortgage and promissory note; production of the original promissory note bearing Plaintiff's signature; full accounting of any alleged debt including principal, interest, fees, and charges; proof of Defendants' legal authority to collect and to initiate foreclosure; documentation of any FHA mortgage insurance claims filed and how proceeds were credited; and explanation for the 90-day delinquency requirement.

101. Under RESPA, 12 U.S.C. § 2605(e), servicers must: (a) acknowledge receipt of a QWR within five business days; (b) provide substantive response addressing each item within thirty business days.

102. Plaintiff received no acknowledgment of the October 17, 2025 QWR within five business days.

103. Plaintiff received no substantive response to the October 17, 2025 QWR within thirty business days or at any time thereafter.

104. The servicer's complete silence on the October 17, 2025 QWR is a per se violation of RESPA's mandatory response requirements.

105. Furthermore, Plaintiff received no information regarding the chain of title to his loan, the original promissory note, how his payments had been applied, evidence of Defendants' authority to foreclose, documentation regarding securitization, or FHA insurance claims.

106. On November 25, 2025, recognizing that Defendants had failed to respond to the initial QWR, Plaintiff served a second comprehensive Notice of Default and second Qualified Written Request



on Defendants Movement Mortgage, ServiceMac, LLC, and Marinosci Law Group, P.C. via United States Postal Service Registered Mail with tracking number RF479859633US.

107. The November 25, 2025 QWR reiterated all requests from the October 17, 2025 QWR and additionally requested: copies of all servicing files and loan documentation; explanation and proof regarding the March 10, 2025 MERS assignment; certification that any affidavits supporting foreclosure were executed by actual officers with personal knowledge; and proof that all foreclosure documents were prepared in compliance with Massachusetts law and federal requirements.

108. Plaintiff received no acknowledgment of the November 25, 2025 QWR within five business days.

109. Plaintiff received no substantive response to the November 25, 2025 QWR within thirty business days or at any time thereafter.

110. The complete failure to respond to both QWRs demonstrates: (a) Defendants' inability or unwillingness to produce documentation; (b) Defendants' consciousness of guilt regarding defects in their standing; (c) Defendants' disregard for federal law governing mortgage servicing; and (d) Defendants' intent to proceed with foreclosure despite inability to establish basic requirements.

## L. The Foreclosure and Imminent Sale

111. Defendants initiated foreclosure proceedings on Plaintiff's Property under Massachusetts Land Court File Number 25-06071-FC.

112. The foreclosure sale was originally scheduled for March 31, 2026. It has been postponed three times: from March 31, 2026 to April 30, 2026; from April 30, 2026 to June 16, 2026; and from June 16, 2026 to July 9, 2026.

113. The repeated postponements suggest: (a) Defendants' inability to cure the fundamental defects in the foreclosure; (b) Defendants' knowledge that they lack standing or authority to foreclose; and (c) attempts to delay resolution while maintaining cloud on Plaintiff's title and threat of foreclosure.

114. The current foreclosure sale is scheduled for July 9, 2026, which is only approximately [8] days away from the date of filing this Amended Complaint.

115. Plaintiff alleges that Defendants have proceeded toward foreclosure without: (a) producing the original promissory note; (b) establishing that Movement Mortgage holds both the note and a

valid assignment of the Mortgage; (c) responding to Plaintiff's demands for validation of the debt; (d) establishing the existence of the purported affiant "Thomas Abbalie"; (e) complying with RESPA's requirements regarding Qualified Written Requests; and (f) providing any documentation regarding the securitization, chain of title, or Defendants' authority to foreclose.

116. A foreclosure sale scheduled for July 9, 2026 would transfer title to Plaintiff's home to a third-party purchaser, thereby: (a) creating a permanent cloud on title; (b) making recovery of the property impossible absent costly and protracted litigation; (c) extinguishing Plaintiff's equity of approximately $174,000; (d) destroying Plaintiff's primary residence; (e) threatening Plaintiff and his animals with homelessness; and (f) creating irreparable harm that cannot be adequately remedied by monetary damages.

## M. Plaintiff's Documented Injuries

117. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff has suffered the following documented injuries:

118. Loss of Home Equity: Plaintiff's equity in the Property valued at approximately $174,000 will be completely lost upon foreclosure sale to a third-party purchaser, with no compensation to Plaintiff. This equity was built through five years of timely mortgage payments, property maintenance, and personal investment.

119. Depleted Savings: Plaintiff has expended $20,000 from personal savings in attempting to retain legal counsel, prepare Qualified Written Requests, conduct investigation into the securitization, defend against the unlawful foreclosure, and maintain his home during the delinquency period.

120. Emotional Distress: For the past eighteen months, Plaintiff has suffered severe emotional and psychological distress including: nearly nightly insomnia and nightmares; persistent anxiety and panic attacks; depression including loss of interest in activities and social withdrawal; physical manifestations including weight loss, loss of appetite, and chronic headaches; disruption to family relationships due to financial stress; and inability to secure stable employment due to the constant threat of homelessness.

121. Lost Income: Plaintiff has been unable to secure stable employment due to the ongoing threat of homelessness and the mental health deterioration caused by the constant uncertainty about his housing situation.



122. Costs of Defense: Plaintiff has incurred significant costs in defending against the unlawful foreclosure, including legal consultation fees, court filing fees, postal service costs, and costs of investigation.

123. Loss of Peace of Mind: For five years, Plaintiff's home was his sanctuary and place of stability. For the past eighteen months, the threat of losing that home has destroyed his sense of safety and security, created constant existential anxiety about future housing, and caused him to experience symptoms of post-traumatic stress.

124. Threat of Homelessness: Plaintiff faces the real and imminent prospect of being homeless on July 9, 2026 if the foreclosure sale proceeds. This threat includes fear about where he and his animals will live, whether he will have adequate shelter, whether he will be able to maintain employment without stable housing, and whether he will lose custody of the 4 dogs that are his family.

## V. DISCOVERY OBLIGATIONS AND BURDEN-SHIFTING REGARDING SECURITIZATION ALLEGATIONS

125. Plaintiff's allegations regarding the securitization structure, CUSIP designations, pool identifications, investor ownership, and derivative instruments are based upon independent investigation and verified database research, not upon information provided by Defendants. Defendants have exclusive possession and control of complete securitization documentation.

126. During discovery, Defendants shall be required to produce, in response to interrogatories, requests for production of documents, and requests for admission, complete documentation proving or disproving each of the following: (a) The actual CUSIP designations for Plaintiff's loan; (b) The actual pool in which Plaintiff's loan is located; (c) The actual investor ownership structure; (d) The actual derivative instrument (if any) in which Plaintiff's loan serves as collateral; (e) Complete and accurate identification of all investors or purchasers of any profits and interests derived from Plaintiff's loan securitization; (f) Complete and accurate identification of the guarantor(s) of the mortgage-backed security in which Plaintiff's loan is included; (g) All pooling and servicing agreements governing Plaintiff's loan; (h) All securitization prospectuses or disclosure documents that reference Plaintiff's loan; (i) All loan-level disclosure documents identifying Plaintiff's loan within any securitization.

127. If Defendants cannot produce documentary evidence proving the allegations above, or if the evidence Defendants produce contradicts Plaintiff's allegations based on independent

investigation, Defendants must admit as much through their discovery responses. Defendants' inability to produce evidence or their admissions of non-existence will support Plaintiff's allegations and support an inference that Defendants lack authority to collect and foreclose.

128. Furthermore, under Federal Rule of Evidence 501 (Presumptions and Burden of Proof) and Massachusetts General Laws Chapter 93A, § 9(2), Defendants' refusal or failure to produce available documentation regarding securitization, chain of title, and investor ownership, combined with Defendants' prior refusal to respond to Qualified Written Requests, shall support an inference of consciousness of guilt and knowledge of defects in Defendants' authority to foreclose.

## VI. CAUSES OF ACTION

### COUNT I: SECURITIES FRAUD

(Against Movement Mortgage, LLC; Goldman Sachs Mortgage Company; Specialized Loan Servicing, LLC; PIMCO; Ginnie Mae; and Does 1-10)

129. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

130. Mortgage-backed securities are securities within the meaning of the Securities Act of 1933, 15 U.S.C. § 77a et seq., and the Securities Exchange Act of 1934, 15 U.S.C. § 78a et seq.

131. Defendants securitized Plaintiff's mortgage note by: (a) Goldman Sachs Mortgage Company purchasing the loan from the originator and aggregating it with other FHA-insured loans; (b) pooling these loans into Ginnie Mae Pool 2021-18 (CUSIP 3140G1XZ7); (c) Government National Mortgage Association (Ginnie Mae) guaranteeing the pool; and (d) selling the cash flows from this pool to PIMCO (Pacific Investment Management Company), which purchased the entire pool through PIMCO Ginnie Mae Trust 2023-A (CUSIP 72248RAB3).

132. In connection with this securitization, Defendants made material misrepresentations and omissions to: (a) Plaintiff as borrower and beneficial owner of the loan; (b) Ginnie Mae and other securitization participants; and (c) investors relying on securitization disclosures.

133. Defendants' communications falsely represented or omitted material information regarding the actual securitization structure. These false references to non-existent or inaccurate pool identifications were designed to misdirect investigators, auditors, and legal advocates away from the correct securitization structure and the actual investor. This constitutes a deliberate

misdirection tactic designed to obscure the true securitization structure and actual investor ownership.

134. OMISSION TO PLAINTIFF: Defendants omitted and failed to disclose to Plaintiff: (a) that his promissory note had been securitized and sold into a Ginnie Mae pool; (b) that Ginnie Mae guaranteed investor payments regardless of borrower performance; (c) that PIMCO owned the cash flows from his loan; (d) that the securitization created conflicting financial incentives for the servicer (profiting from default through FHA insurance claims); (e) that servicers in Ginnie Mae pools receive directives from Ginnie Mae to optimize pool performance at the expense of individual borrower protections; and (f) the actual securitization structure and investor information.

135. SCIENTER: Defendants acted with knowledge of the falsity of their representations and the materiality of their omissions. Evidence of scienter includes: (a) Movement Mortgage's $23.75 million FHA fraud settlement proving knowledge of federal requirements and intentional violations; (b) the specific misdirection regarding securitization structure, showing intent to obscure; (c) the omission of actual investor information (PIMCO) and guarantor structure (Ginnie Mae); (d) the deliberate steering toward manufactured default; (e) the deliberate payment lockout; and (f) the filing of fraudulent affidavits.

136. RELIANCE AND CAUSATION: Plaintiff relied on Defendants' misrepresentation and omissions. Plaintiff could not discover the actual securitization because Defendants deliberately concealed it. Plaintiff relied on the servicer's false statement regarding the 90-day delinquency requirement and became delinquent. The manufactured default created the conditions for foreclosure. The obscured securitization prevented Plaintiff from understanding the servicer's conflicting financial incentives to profit from his default.

137. INJURY: Plaintiff suffered injury including loss of $174,000 in equity, $20,000 in depleted savings, eighteen months of severe emotional distress, inability to secure employment, and threat of imminent homelessness.

138. ACTIONABLE LEGAL THEORY: This securities fraud is actionable under 15 U.S.C. § 77a et seq. (Securities Act of 1933) and 15 U.S.C. § 78a et seq. (Securities Exchange Act of 1934), which prohibit material misrepresentations and omissions in connection with the offer and sale of securities, and which apply to the securitization and sale of mortgage-backed securities.

**COUNT II: BREACH OF FIDUCIARY DUTY**

(Against Movement Mortgage, LLC; ServiceMac, LLC; and Specialized Loan Servicing, LLC)

139. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

140. Movement Mortgage, ServiceMac, and Specialized Loan Servicing acted as mortgage servicers for Plaintiff's loan. As servicers, they owed fiduciary duties to Plaintiff, including duties to: (a) service the loan in accordance with FHA requirements and applicable law; (b) provide accurate information and disclosures; (c) respond to borrower inquiries and requests; (d) refrain from taking actions designed to benefit Defendants at Plaintiff's expense; (e) maintain and provide documentation regarding the loan; and (f) refrain from fraudulent or deceptive conduct.

141. Defendants breached these fiduciary duties through: (a) misrepresenting FHA loss-mitigation requirements to force Plaintiff into default; (b) placing Plaintiff in forbearance without written documentation; (c) locking Plaintiff out of his payment system and preventing him from resuming payments despite his willingness and financial ability; (d) failing to respond to Qualified Written Requests; (e) proceeding toward foreclosure without establishing standing or authority; (f) filing a fraudulent affidavit by a non-existent officer; (g) failing to disclose the securitization or its implications; and (h) prioritizing investor interests over borrower protections.

142. Plaintiff suffered damages as a result of Defendants' breach of fiduciary duty in amounts to be proven at trial.

## COUNT III: VIOLATION OF THE REAL ESTATE SETTLEMENT PROCEDURES ACT (RESPA)

(Against Movement Mortgage, LLC; ServiceMac, LLC)

143. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

144. Defendants Movement Mortgage and ServiceMac are mortgage servicers within the meaning of 12 U.S.C. § 2605(a).

145. On October 17, 2025, and November 25, 2025, Plaintiff served timely and proper Qualified Written Requests on Defendants, as detailed above, requesting information necessary to verify the debt and Defendants' authority to collect.

146. Under 12 U.S.C. § 2605(e), servicers must: (a) acknowledge receipt of a QWR within five business days; (b) investigate the inquiry and provide substantive response within thirty business days; (c) correct any errors found in servicer records.

147. Defendants failed to provide acknowledgment of either QWR within five business days.

148. Defendants failed to provide substantive response to either QWR within thirty business days or at any time thereafter.

149. Defendants' failure to respond to both QWRs constitutes clear violation of 12 U.S.C. § 2605(e).

150. Defendants' failure to respond also demonstrates that they cannot or will not produce documentation establishing their standing to collect and foreclose.

151. As a result of these violations, Plaintiff is entitled to actual damages and statutory damages under 12 U.S.C. § 2605(f), including: (a) actual damages suffered as result of Defendants' noncompliance; (b) in the case of a pattern or practice of noncompliance, statutory damages of not less than $100 and not more than $1,000 per violation; (c) reasonable costs and attorney's fees.

## COUNT IV: VIOLATION OF THE FAIR DEBT COLLECTION PRACTICES ACT (FDCPA)

(Against ServiceMac, LLC; Marinosci Law Group, P.C.)

152. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

153. ServiceMac, LLC and Marinosci Law Group, P.C. are debt collectors within the meaning of 15 U.S.C. § 1692a(6), as they regularly engage in debt collection activities and foreclosure proceedings.

154. In his Qualified Written Requests dated October 17, 2025 and November 25, 2025, and in his affidavit submitted in connection with the pending foreclosure, Plaintiff submitted written disputes regarding the validity of the debt and requests for validation and verification pursuant to 15 U.S.C. § 1692g.

155. Under 15 U.S.C. § 1692g(b), upon receipt of a timely written dispute from a consumer, a debt collector must cease all collection activity until it obtains and mails verification of the debt to the consumer.

156. Defendants received Plaintiff's written disputes and validation requests through the Qualified Written Requests, but failed to cease collection and foreclosure activities.

157. Instead of ceasing collection, Defendants continued and accelerated foreclosure proceedings despite the unresolved dispute and failure to provide validation.

158. Defendants' continued collection and foreclosure activities in violation of 15 U.S.C. § 1692g constitutes violation of the Fair Debt Collection Practices Act.

159. Under 15 U.S.C. § 1692k, Plaintiff is entitled to recover: (a) actual damages suffered as result of Defendants' FDCPA violations; (b) additional damages of not less than $100 and not more than $1,000 per violation; (c) reasonable costs and attorney's fees.

## COUNT V: WRONGFUL FORECLOSURE / LACK OF AUTHORITY UNDER MASSACHUSETTS LAW

(Against Movement Mortgage, LLC; MERS; Marinosci Law Group, P.C.)

160. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

161. Under Massachusetts law as established in *U.S. Bank National Ass'n v. Ibanez*, 458 Mass. 637 (2011), and *Eaton v. Federal National Mortgage Association*, 462 Mass. 569 (2012), a party seeking to foreclose must: (a) hold and possess the original promissory note at the time the notice of foreclosure sale is published; (b) demonstrate a valid chain of title to the mortgage with proper assignments; (c) have authority to foreclose derived from holding the note and valid assignment of the mortgage.

162. Defendants have failed to establish all three prerequisites for foreclosure:

163. NO ORIGINAL NOTE: Defendants have not produced and do not possess the original promissory note bearing Plaintiff's signature. Without possession of the original note, Defendants lack standing to foreclose under *Ibanez*.

164. VOID MERS ASSIGNMENT: The March 10, 2025 assignment from MERS to Movement Mortgage is void ab initio under *Eaton* because MERS held no beneficial interest in the note and therefore lacked authority to assign the mortgage. Movement Mortgage acquired no rights through this void assignment.

165. NO AUTHORITY: Because the MERS assignment is void, Defendants cannot rely on it to establish authority. Because Defendants cannot produce the original note with valid chain of assignment, Defendants have no authority to foreclose.

166. The foreclosure sale scheduled for July 6, 2026 is unlawful and should be declared void.

167. Plaintiff is entitled to injunctive relief preventing the foreclosure sale and declaratory relief declaring the foreclosure void.

## COUNT VI: UNFAIR AND DECEPTIVE ACTS AND PRACTICES

(M.G.L. c. 93A § 9) (Against All Defendants)



168. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

169. All Defendants are engaged in trade or commerce within the meaning of Massachusetts General Laws Chapter 93A.

170. Defendants' conduct constitutes a pattern of unfair and deceptive acts or practices, including: (a) misrepresenting FHA loss-mitigation requirements to Plaintiff; (b) placing Plaintiff in forbearance without written documentation; (c) locking Plaintiff out of his payment system and preventing cure; (d) failing to respond to Qualified Written Requests; (e) proceeding with foreclosure without establishing standing or authority; (f) securitizing Plaintiff's loan without disclosure; (g) filing fraudulent affidavit by non-existent officer; (h) recording void assignment from MERS; (i) falsely referencing securitization information; and (j) concealing conflicts of interest between servicer obligations and investor profit incentives.

171. Defendants' conduct was knowing or willful within the meaning of M.G.L. c. 93A, § 9(2). Evidence includes: the $23.75 million FHA fraud settlement proving knowledge of federal requirements; the deliberate targeting of 90-day delinquency threshold; the deliberate payment lockout; the filing of fraudulent affidavit; and the refusal to respond to legal requests.

172. Plaintiff has suffered injury including financial loss, the threatened loss of his home, emotional distress, depleted savings, and costs of defending against unlawful foreclosure.

173. Under M.G.L. c. 93A, § 9, Plaintiff is entitled to: (a) actual damages; (b) multiple damages (treble damages = 3x actual damages) for knowing or willful violations; (c) reasonable attorney's fees and costs.

## COUNT VII: COMMON LAW FRAUD

(Against All Defendants)

174. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

175. Defendants made the following material misrepresentations:

176. First, Defendants represented through the servicer that Plaintiff "had to be 90 days delinquent to get loss mitigation." This representation was false under 24 C.F.R. § 203.604, which prohibits conditioning all loss-mitigation assistance on the borrower first becoming delinquent. This misrepresentation was made knowing it was false or with reckless disregard for its truth, as evidenced by the $23.75 million FHA fraud settlement.

177. Second, Defendants represented that "forbearance would be available for up to 18 months." This statement, while made, was not honored in practice. When Plaintiff obtained employment

and tried to resume payments after approximately 11 months of forbearance, Defendants locked him out of his payment system, showing that forbearance was not truly available as represented.

178. Third, Defendants represented through their public actions that they held valid authority to foreclose. This representation was false. Defendants did not possess the original note, had received a void assignment from MERS, and had failed to establish chain of title. This misrepresentation was made knowing it was false or with reckless disregard.

179. Fourth, Defendants represented through the filing of an affidavit that "Thomas Abbalie, Vice President of Movement Mortgage" had personal knowledge of facts regarding Plaintiff's loan and Defendants' authority to foreclose. This representation was false because no such person exists in Movement Mortgage's corporate structure. This misrepresentation was made knowing it was false.

180. Fifth, Defendants represented through silence and omission that Plaintiff's loan was not securitized and that his original loan documents governed his loan arrangement. This was false. Plaintiff's loan had been securitized, was collateral for PIMCO Ginnie Mae Trust 2023-A, and was governed by pooling and servicing agreement rather than original documents.

181. Sixth, Defendants made false representations regarding the securitization structure and investor ownership designed to conceal the actual securitization and actual investor from Plaintiff and others.

182. Defendants made these misrepresentations knowing them to be false or with reckless disregard for their truth.

183. Defendants intended to deceive Plaintiff and induce him to: (a) become delinquent so they could profit from manufactured default; (b) refrain from asserting defenses against foreclosure; (c) forego investigation into their authority; and (d) allow the foreclosure sale to proceed without challenge.

184. Plaintiff relied on these misrepresentations to his severe detriment. Plaintiff relied on the 90-day delinquency requirement and allowed himself to become delinquent. Plaintiff relied on the forbearance approval and did not pursue alternative employment or financial solutions more aggressively. Plaintiff could not discover the securitization because Defendants concealed it. Plaintiff could not discover the fraud regarding authority because Defendants filed false affidavits claiming authority they did not possess.

185. Plaintiff suffered damages including property loss, financial injury, and emotional distress in amounts to be proven at trial.

**COUNT VIII: ABUSE OF PROCESS**

(Against All Defendants)

186. Plaintiff incorporates by reference all preceding allegations as though fully set forth herein.

187. Defendants initiated and have continued foreclosure proceedings under Massachusetts Land Court File Number 25-06071-FC.

188. Defendants lacked authority to foreclose, as detailed above: void MERS assignment, no original note, failed QWR responses, fraudulent affidavit.

189. Defendants have continued the foreclosure despite knowing of these defects. Rather than curing the defects, they have postponed the sale three times while maintaining the cloud on Plaintiff's title and the threat of foreclosure.

190. Defendants have used the foreclosure process for improper purposes including: (a) obscuring the securitization scheme; (b) silencing Plaintiff's challenges to the debt; (c) extracting Plaintiff's home equity for the benefit of securitization investors; (d) avoiding accountability for prior FHA fraud; and (e) creating appearance of authority they do not possess.

191. Defendants' use of the foreclosure process for improper purposes constitutes abuse of process.

192. Plaintiff is entitled to damages and injunctive relief.

## VII. DAMAGES

193. As a direct and proximate result of Defendants' unlawful conduct, Plaintiff seeks the following damages:

**A. Economic Damages**

194. Loss of Home Equity: The fair market value of the Property is approximately $369,050. The remaining mortgage balance is approximately $196,000. Plaintiff's equity is therefore approximately $174,000. Upon the foreclosure sale on July 9, 2026, this entire equity will be lost with no compensation to Plaintiff.

195. Depleted Personal Savings: Plaintiff has expended $20,000 from personal savings in attempting to retain counsel, prepare Qualified Written Requests, investigate the securitization, and defend against foreclosure.



196. Costs of Defense: Plaintiff has incurred and will continue to incur significant costs in defending against the unlawful foreclosure, including legal consultation fees, court filing fees, costs of service by certified mail with tracking, costs of investigation into securitization records and corporate filings, costs of obtaining property appraisals and comparable sales data, and costs of document reproduction and analysis.

197. Lost Wages and Diminished Earning Capacity: As a direct result of the severe emotional distress, anxiety, insomnia, and constant threat of homelessness caused by Defendants' conduct, Plaintiff has been unable to secure and maintain stable employment. Plaintiff has lost wages during periods when he was unable to work due to mental health deterioration. Plaintiff's future earning capacity has been diminished by the ongoing threat to his housing security and the psychological trauma of the past eighteen months.

198. Increased Cost of Living: Due to the threat of foreclosure and the uncertainty regarding his housing situation, Plaintiff has incurred increased costs including: temporary housing solutions, storage fees for personal belongings, increased insurance costs due to housing instability, transportation costs related to court appearances and legal consultations, and costs of maintaining communication (phone, mail services) necessary to defend against the foreclosure.

**B. Non-Economic Damages**

199. Severe Emotional Distress: For the past eighteen months, Plaintiff has suffered severe emotional and psychological distress as a direct result of Defendants' unlawful conduct. This distress includes: nearly nightly insomnia and nightmares in which Plaintiff relives the servicer's false statements and dreams of losing his home; persistent and debilitating anxiety and panic attacks triggered by mail delivery, telephone calls, or any communication that might relate to the foreclosure; clinical depression including loss of interest in activities Plaintiff previously enjoyed, social withdrawal from family and friends, and inability to engage in normal daily activities; physical manifestations of psychological distress including significant weight loss, loss of appetite, chronic tension headaches, and elevated blood pressure; disruption to presonal relationships and inability to be present emotionally for family members due to financial stress and preoccupation with the foreclosure threat; symptoms consistent with post-traumatic stress disorder including hypervigilance, avoidance behaviors, and intrusive thoughts regarding loss of his home.

200. This emotional distress was foreseeable and directly caused by Defendants' knowing misrepresentations regarding the 90-day delinquency requirement, the deliberate payment lockout that prevented Plaintiff from curing his delinquency despite his willingness and ability to do so, the failure to respond to legal requests for information, the filing of fraudulent affidavits, and the relentless pursuit of foreclosure despite lacking basic authority to do so.

201. Loss of Peace of Mind and Sense of Security: For five years prior to November 2024, Plaintiff's home was his sanctuary, his place of stability, and the foundation of his sense of security. His home represented not merely shelter but the culmination of years of financial responsibility, timely payments, and personal investment. The deliberate and wrongful threat to that home has destroyed Plaintiff's sense of safety and security. Plaintiff lives with constant existential anxiety regarding where he will live, whether he will become homeless, whether he will be able to maintain employment without stable housing, and whether the financial devastation from this wrongful foreclosure will prevent him from ever rebuilding financial security.

202. Threat of Homelessness: Plaintiff faces the real and imminent prospect of being without stable housing on or shortly after July 6, 2026 if the foreclosure sale proceeds. This threat includes fear about where he will sleep, whether he will have access to basic hygiene facilities, whether he will be able to maintain employment without an address, whether potential employers will hire someone without stable housing, and the cascading consequences of homelessness on his physical health, mental health, and future prospects.

## C. Punitive Damages

203. Defendants' conduct was knowing, willful, and undertaken with conscious disregard for Plaintiff's rights and wellbeing. Evidence of the reprehensible nature of Defendants' conduct includes: Movement Mortgage's prior $23.75 million settlement of FHA fraud allegations, demonstrating that Defendants understood federal law and chose to violate it anyway; the deliberate targeting of the 90-day delinquency threshold to trigger FHA insurance claims from which Defendants profited; the deliberate placement of Plaintiff in a forbearance without written documentation, preventing Plaintiff from understanding his obligations or rights and creating confusion that prolonged the delinquency; the deliberate lockout of Plaintiff's payment system when he attempted to resume payments after securing employment, preventing Plaintiff from curing his delinquency despite his willingness and financial ability to do so; the filing of an affidavit purportedly signed by a non-existent officer ("Thomas Abbalie, Vice President"),

demonstrating Defendants' willingness to fabricate documents and commit perjury; the complete refusal to respond to two Qualified Written Requests, demonstrating Defendants' disregard for federal law and their inability or unwillingness to justify their conduct; the recording of a void assignment from MERS while knowing MERS held no beneficial interest in the note, creating a cloud on Plaintiff's title; the concealment of securitization from Plaintiff, depriving him of information material to his understanding of his loan and his rights; the relentless pursuit of foreclosure despite lacking possession of the original promissory note and lacking valid chain of title.

204. Defendants' conduct exhibits a pattern of deliberate deception, knowing violation of federal law, and prioritization of investor profit over borrower protection and legal compliance. This conduct was undertaken for financial gain and demonstrates conscious indifference to Plaintiff's rights and dignity.

205. Punitive damages are appropriate to punish Defendants for this reprehensible conduct and to deter Defendants and similarly situated servicers and lenders from engaging in identical conduct in the future.

206. Plaintiff seeks punitive damages in an amount to be determined by the jury, but in an amount sufficient to punish Defendants and deter future violations of federal law, state law, and basic principles of fair dealing.

## D. Statutory Damages

207. Under 12 U.S.C. § 2605(f), for Defendants' violations of the Real Estate Settlement Procedures Act in failing to respond to Qualified Written Requests, Plaintiff is entitled to recover statutory damages of not less than $100 and not more than $1,000 per violation, in addition to actual damages and reasonable attorney's fees and costs.

208. Defendants received two separate Qualified Written Requests (October 17, 2025 and November 25, 2025), each of which constitutes a separate violation of 12 U.S.C. § 2605(e). Plaintiff is entitled to statutory damages for each violation.

209. Under 15 U.S.C. § 1692k, for Defendants' violations of the Fair Debt Collection Practices Act in continuing collection and foreclosure activities after receipt of written disputes regarding the validity of the debt, Plaintiff is entitled to recover statutory damages of not less than $100 and not more than $1,000 per violation, in addition to actual damages and reasonable attorney's fees and costs.

210. Under Massachusetts General Laws Chapter 93A, § 9, for Defendants' knowing and willful unfair and deceptive acts or practices, Plaintiff is entitled to recover treble damages (three times actual damages) and reasonable attorney's fees and costs. If Defendants' conduct was not knowing and willful, Plaintiff is entitled to recover double damages (two times actual damages) and reasonable attorney's fees and costs.

211. Under 15 U.S.C. § 77k (Securities Act of 1933) and applicable securities law, Plaintiff is entitled to recover all damages caused by securities fraud, including but not limited to the loss of $144,000 in home equity, all costs incurred in defense against the foreclosure, all emotional distress damages, and punitive damages as appropriate.

**E. Attorney's Fees and Costs**

212. Plaintiff has retained legal counsel and it is a significant possibility that Plaintiff could incur additional legal fees in preparing this Amended Complaint, and defending against the unlawful foreclosure. Plaintiff is entitled to recover all reasonable legal fees and costs under: 12 U.S.C. § 2605(f) (RESPA attorney's fees provision); 15 U.S.C. § 1692k (FDCPA attorney's fees provision); Massachusetts General Laws Chapter 93A, § 9 (93A attorney's fees provision); Common law principles of fraud and breach of fiduciary duty; Federal Rule of Civil Procedure 65 (preliminary and permanent injunctive relief).

213. Reasonable attorney's fees include all hours expended in investigation, legal research, document review, securitization analysis, motion practice, discovery, depositions, trial preparation, and trial itself.

214. Costs include court filing fees, service of process costs, costs of obtaining certified copies of recorded documents, costs of expert analysis, costs of investigation, costs of obtaining property appraisals and comparable sales data, postal service costs, and all other costs reasonably incurred in prosecuting this action.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiff Auron Caelum Stark respectfully requests that this Court grant the following relief:

**A. INJUNCTIVE RELIEF**

31 of 38

215. A preliminary injunction and temporary restraining order immediately halting the foreclosure sale scheduled for July 9, 2026, as well as any and all future sales pending final resolution of this action.

216. A permanent injunction preventing Defendants from foreclosing on the Property at 14 Goodman Lane, Pittsfield, Massachusetts 01201.

217. A permanent injunction requiring Defendants to cease all collection activities related to Plaintiff's loan.

218. An injunction requiring Defendants to remove all clouds on Plaintiff's title created by the void MERS assignment and foreclosure filing.

## B. DECLARATORY RELIEF

219. A declaration that the MERS assignment recorded at Book 07789, Page 348 is void ab initio and conveys no rights to Movement Mortgage, LLC.

220. A declaration that Movement Mortgage, LLC lacks standing to foreclose on the Property.

221. A declaration that Defendants' foreclosure proceedings in Massachusetts Land Court File Number 25-06071-FC are unlawful and void.

222. A declaration that Plaintiff's promissory note and mortgage remain in full force and effect and are not subject to foreclosure by Defendants.

223. A declaration that Defendants violated 12 U.S.C. § 2605 (RESPA) by failing to respond to Qualified Written Requests.

224. A declaration that Defendants violated 15 U.S.C. § 1692g (FDCPA) by continuing collection activities after receipt of written disputes.

## C. COMPENSATORY DAMAGES

225. Judgment in favor of Plaintiff for loss of home equity in the amount of $174,000.

226. Judgment in favor of Plaintiff for depleted personal savings in the amount of $20,000.

227. Judgment in favor of Plaintiff for costs of defense including attorney's fees, court costs, investigative costs, and postal service costs in the amount to be proven at trial.

228. Judgment in favor of Plaintiff for lost wages and diminished earning capacity in the amount to be proven at trial.

229. Judgment in favor of Plaintiff for increased cost of living in the amount to be proven at trial.

230. Judgment in favor of Plaintiff for severe emotional distress in the amount to be proven at trial.

231. Judgment in favor of Plaintiff for loss of peace of mind and sense of security in the amount to be proven at trial.

232. Judgment in favor of Plaintiff for threat of homelessness and related anxiety in the amount to be proven at trial.

## D. STATUTORY DAMAGES

233. Judgment in favor of Plaintiff against Movement Mortgage, LLC and ServiceMac, LLC for RESPA violations in the amount $1,000 per violation under 12 U.S.C. § 2605(f).

234. Judgment in favor of Plaintiff against ServiceMac, LLC and Marinosci Law Group, P.C. for FDCPA violations in the amount of $1,000 per violation under 15 U.S.C. § 1692k.

235. Judgment in favor of Plaintiff against all Defendants for Massachusetts Chapter 93A violations in treble damages (three times actual damages) or double damages (two times actual damages) as appropriate under M.G.L. c. 93A, § 9.

## E. PUNITIVE DAMAGES

236. Judgment in favor of Plaintiff for punitive damages in an amount sufficient to punish Defendants' knowing and willful violations of federal law and state law and to deter similar conduct in the future, in an amount to be determined by the jury.

## F. ATTORNEY'S FEES AND COSTS

237. Judgment in favor of Plaintiff for all reasonable attorney's fees and costs incurred in investigating, preparing, and prosecuting this action, including but not limited to fees under 12 U.S.C. § 2605(f), 15 U.S.C. § 1692k, and M.G.L. c. 93A, § 9.

238. Judgment for pre-judgment interest at the maximum rate permitted by law from the date each element of damages accrued.

239. Judgment for post-judgment interest at the maximum rate permitted by law until final payment.

## G. FURTHER RELIEF

240. Such other and further relief as the Court deems just, proper, and equitable.

## IX. JURY DEMAND

Plaintiff AURON CAELUM STARK, by and through counsel, hereby demands a trial by jury on all issues of fact presented in this action, pursuant to Federal Rule of Civil Procedure 38(b) and the Seventh Amendment to the United States Constitution.

Plaintiff is entitled to a jury trial as of right because this action involves claims for damages at law, including securities fraud, breach of fiduciary duty, violations of federal consumer protection statutes, common law fraud, and violations of state consumer protection law. The claims for compensatory damages, statutory damages, and punitive damages are all legal claims that carry the right to jury determination of facts.

241. The following issues of fact are appropriate for jury determination: Whether Defendants made material misrepresentations regarding the 90-day delinquency requirement for loss mitigation assistance, and whether such representations were false under applicable FHA regulations; Whether Defendants omitted material information regarding the securitization of Plaintiff's loan, the transfer of his promissory note to investors, the existence of conflicting financial incentives, and the removal of FHA borrower protections; Whether Defendants knew or recklessly disregarded the falsity of their representations regarding FHA loss-mitigation requirements; Whether Plaintiff reasonably relied on Defendants' representations regarding the 90-day delinquency threshold; Whether Defendants deliberately placed Plaintiff in a forbearance without written documentation as part of a scheme to extend Plaintiff's delinquency; Whether Defendants deliberately locked Plaintiff out of his online payment system to prevent him from curing his delinquency despite his willingness and financial ability to make payments; Whether the servicer representative's statement that "Plaintiff could not receive loss mitigation unless 90 days delinquent" violated 24 C.F.R. § 203.604 and HUD guidance governing FHA-insured loans; Whether Defendants' conduct in steering Plaintiff toward manufactured default was undertaken with intent to trigger FHA insurance claims that would benefit servicers and investors; Whether Defendants possessed and disclosed the original promissory note bearing Plaintiff's signature; Whether Defendants established a valid chain of assignment from the original lender through

each intermediate holder to Movement Mortgage, LLC; Whether the March 10, 2025 assignment from MERS to Movement Mortgage is void ab initio under *Eaton v. Federal National Mortgage Association*, 462 Mass. 569 (2012), because MERS held no beneficial interest in the promissory note; Whether Movement Mortgage, LLC had authority to foreclose on the Property under Massachusetts law as established in *U.S. Bank National Ass'n v. Ibanez*, 458 Mass. 637 (2011); Whether an affidavit purportedly signed by "Thomas Abbalie, Vice President of Movement Mortgage" was executed by a non-existent officer, and whether the filing of such affidavit constitutes perjury and fraud upon the court; Whether Defendants received Plaintiff's Qualified Written Requests dated October 17, 2025 and November 25, 2025, and whether Defendants failed to acknowledge receipt within five business days as required by 12 U.S.C. § 2605(e); Whether Defendants failed to provide substantive response to both Qualified Written Requests within thirty business days as required by 12 U.S.C. § 2605(e); Whether Defendants' failure to respond to Qualified Written Requests constitutes a violation of the Real Estate Settlement Procedures Act; Whether Defendants continued collection and foreclosure activities after receiving Plaintiff's written disputes regarding the validity of the debt in violation of 15 U.S.C. § 1692g; Whether Defendants are debt collectors within the meaning of 15 U.S.C. § 1692a(6); Whether Defendants' conduct constitutes unfair and deceptive acts or practices under Massachusetts General Laws Chapter 93A, § 9; Whether Defendants' conduct was knowing or willful within the meaning of M.G.L. c. 93A, § 9(2); Whether Defendants made common law fraud by misrepresenting Plaintiff's eligibility for loss mitigation, the terms of forbearance, their authority to foreclose, and the securitization of his loan; Whether Defendants made these misrepresentations with knowledge of their falsity or with reckless disregard for their truth; Whether Plaintiff relied on Defendants' misrepresentations to his detriment; Whether Defendants used the foreclosure process for improper purposes, including obscuring the securitization scheme, silencing Plaintiff's challenges, extracting home equity, and creating false appearance of authority; Whether Movement Mortgage, LLC had prior knowledge of FHA requirements and intentionally violated them, as evidenced by the $23.75 million settlement of FHA fraud allegations; Whether the securitization of Plaintiff's loan without disclosure violated securities laws and Plaintiff's right to informed consent; Whether Defendants owed fiduciary duties to Plaintiff as the servicer of his loan; Whether Defendants breached their fiduciary duties through misrepresentation, omission, failure to respond to requests, and prioritization of investor interests over borrower protections; The amount of Plaintiff's actual damages, including but not limited to loss of home equity, depleted

savings, costs of defense, lost wages, increased cost of living, and non-economic damages; Whether Plaintiff is entitled to statutory damages under RESPA, the FDCPA, and Massachusetts Chapter 93A, and if so, in what amount; Whether Defendants' conduct was sufficiently reprehensible, knowing, and willful to warrant punitive damages, and if so, in what amount; Such other factual issues as may arise during the course of this litigation.

242. Plaintiff specifically requests that the jury determine all issues related to the credibility of witnesses, the weight of evidence, the reasonable inferences to be drawn from the facts, and the application of law to fact. Plaintiff further requests that the jury be empowered to determine whether Defendants' conduct warrants punitive damages and, if so, in what amount sufficient to punish Defendants and deter similar conduct.

243. This jury trial demand is timely made, preserved, and shall not be waived except by written consent of Plaintiff or by order of the Court.

## X. PRESERVATION AND RESERVATION OF DISCOVERY RIGHTS

**auron-caelum: stark©™**, as Lead Counsel of Record and Executor of **AURON CAELUM STARK ESTATE©™**, hereby preserves and reserves all rights to pursue discovery, compel discovery, obtain depositions, request interrogatories, demand production of documents, serve requests for admission, and employ all other discovery mechanisms available under the Federal Rules of Civil Procedure, including but not limited to Rules 26, 27, 28, 29, 30, 31, 33, 34, 36, and 45, without limitation as to scope, timing, or subject matter. Said preservation of discovery rights is made expressly without waiver, without prejudice, and without any limitation whatsoever, and **auron-caelum: stark©™** expressly reserves the right to initiate discovery proceedings at any time during this action, including at trial, post-trial, and in connection with enforcement of any judgment or equitable decree. This preservation of discovery rights shall remain in full force and effect throughout the pendency of this action and any appeals or post-judgment proceedings, and shall not be diminished, waived, or extinguished by any passage of time, any stipulation by opposing counsel, or any order of this Court, except by express written consent of **auron-caelum: stark©™** as Lead Counsel of Record, which consent shall be entered only after full consultation with and approval by the Executor of the **AURON CAELUM STARK ESTATE©™.**

## XI. ARBITRATION CLAUSE AND ECCLESIASTICAL ARBITRATION

Notwithstanding any provision in this instrument or any prior agreement, **auron-caelum: stark©™**, as Executor and Lead Counsel of Record for **AURON CAELUM STARK ESTATE©™**, expressly

reserves the right to elect binding ecclesiastical arbitration under natural law, divine law, and common law principles in lieu of continued statutory court proceedings. In the event that **auron-caelum: stark©™** exercises this election, all parties to this action shall be bound by the arbitration clause set forth herein, and all matters in dispute shall be resolved through binding ecclesiastical arbitration conducted by a neutral arbitrator selected by mutual agreement of the parties or, in the absence of mutual agreement, appointed by **auron-caelum: stark©™** as the Executor exercising arbitration authority under ecclesiastical fundamental principles.

Ecclesiastical arbitration shall be conducted under the following terms and conditions: (1) all arbitration proceedings shall be conducted in private, outside of statutory court proceedings; (2) all decisions of the arbitrator shall be final, binding, and enforceable by all parties without appeal to any statutory court; (3) all arbitration shall proceed under natural law, divine law, ecclesiastical authority, and common law principles, without application of any statutory rules of evidence, statutory procedures, or statutory limitations; (4) the arbitrator shall have authority to award equitable remedies, damages, restitution, and all other relief available under natural law and ecclesiastical principles; and (5) all costs of arbitration shall be borne by the parties in such proportion as the arbitrator determines to be just and equitable.

Election of ecclesiastical arbitration may be exercised at any time by written notice from auron-caelum: stark©™ to all parties and the Court, and upon such election, all statutory court proceedings shall be immediately stayed pending completion of arbitration. This arbitration clause is binding upon all parties and all successors, assigns, and agents of the parties, and shall not be waived, modified, or diminished except by express written agreement of auron-caelum: stark©™ as Executor.

Executed this 30th day of June, in the year of our Lord two thousand and twenty-six.

All rights reserved without prejudice. UCC 1-308 / UCC 1-103 / Non-Assumpsit

**Respectfully submitted**

by: auron-caelum stark

**auron-caelum: stark©™**
**Executor and Sole Beneficiary**
**AURON CAELUM STARK ESTATE©™**
**Lead Counsel of Record**



37 of 38

## NOTARIAL JURAT – WITHOUT PREJUDICE

Notary used without prejudice to my rights, without waiver or alteration of my private status, and without modification of my capacity as Living Man, Beneficial Heir, Holder In Due Course, and Executor and without conferring or consenting to any foreign jurisdiction. The notary's role herein is solely as a witness to the autograph, and does not alter the perfected private and ecclesiastical nature of this instrument.

BE IT REMEMBERED, that on this __1st__ day of ~~June,~~ July in the year of our Lord two thousand and twenty-six, personally appeared before me, the undersigned, a Notary, the Living Man known to me as auron-caelum: stark©™, to be the one whose autograph is subscribed to the within instrument, who, after being duly sworn by me on his unlimited liability as a living soul, did depose and say that the statements within the foregoing instrument are true and correct to the best of his knowledge and belief.

He thereupon subscribed his autograph to the within instrument in my presence.

Given under my hand and seal of office, the day and year aforesaid.

_____
Notary Public

Sitting in, and for, The State of Massachusetts

My Commission Expires:

Claudia M. Paredes
NOTARY PUBLIC
Commonwealth of
Massachusetts
My Commission Expires
10/26/2029

38 of 38

Scribed & affirmed by amen-caelim stott

